UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
*Alexandria Division*

MALIK GILL
603 foxcroft ave
Martinsbrug, WV 25401

    *Plaintiff,*

    *v.*

INOVA HEALTH CARE SERVICES
8110 Gatehouse Rd Ste 200 East Tower
Falls Church, VA 22042,

    *Defendant.*

Case No.:

## COMPLAINT

1. Plaintiff Malik Gill brings this complaint for monetary and equitable relief, through counsel, against Defendant Inova Health Care Services ("**Inova**") under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.* ("**Title VII**") and the Civil Rights Acts of 1866, as amended, 42 U.S.C. § 1981 ("**Section 1981**").

2. This race-based discrimination, harassment, and retaliation matter is predicated on a course of severe and pervasive unwelcome conduct directed at Mr. Gill by his management within Inova that is not based on Mr. Gill's performance but was, instead, based upon his skin color and then his complaints about race-based discrimination.

## JURISDICTION & VENUE

3. This Court has jurisdiction over this action pursuant to multiple federal statutes.

4.    Title VII confers subject matter jurisdiction on this Court to resolve Title VII claims. 42 U.S.C. § 2000e-5(f)(3).

5.    And the Court has subject matter jurisdiction over Mr. Gill's Section 1981 claim pursuant to 28 U.S.C. § 1331.

## PARTIES

6.    Defendant is a non-profit organization that provides health care services across Northern Virginia and the greater Washington, D.C. area through its five hospitals and over twenty clinics, supported by more than 16,000 employees and the 400-plus physicians who work with Inova Medical Group.

7.    Mr. Gill, a resident of Martinsburg, is one of those employees, and he works at Inova Loudoun Hospital at 44045 Riverside Pkwy, Leesburg, VA 20176 as a Unit Secretary in the Behavioral Health Department.

## ADMINISTRATIVE EXHAUSTION

8.    Mr. Gill's Title VII claim, but not his Section 1981 claim, requires administrative exhaustion.

9.    Mr. Gill filed a timely EEOC Charge of discrimination on February 21, 2018 and, afterward, the EEOC issued to him a Dismissal and Notice of Rights, stamped by the Commission as mailed on June 12, 2018.

## FACTS

*Brief Synopsis*

10.    Mr. Gill began working for Inova in November 2014.

11.    Since roughly the summer of 2016, Mr. Gill has endured unwelcome treatment at the hands of several individuals with whom he works.

12.    Mr. Gill believes, owing to specific evidence described below, that one person, his current supervisor Director Kim Davis, has intentionally instigated these acts, and that Ms. Davis has been motivated in this course of conduct, first, by Mr. Gill's race and then later, as a reprisal for Mr. Gill's protected complaints.

13.    As these events have occurred, Mr. Gill has endeavored to report his growing concerns about them to Inova's management and human resource functions.

14.    And he has also grown increasingly concerned that Inova has apparently taken the position that his concerns don't merit serious attention, including after he filed a charge of discrimination with the EEOC.

15.    He now files this complaint, asking the Court and a jury of his peers to do what Inova apparently will not: make the harassment stop.

*False & Half-True Allegations Coupled with Subjective and Non-Specific Criticism*

16.    When Mr. Gill reports to his shifts (he works the night shift) he is expected to perform certain standard tasks (his "**Regular Duties**").

17.     One such category of tasks involves charts: creating them, labeling them, and breaking them down.

18.     These Regular Duties are part of each unit secretary's job, and Mr. Gill, as a unit secretary, is expected by Inova to perform them.

19.     On multiple occasions, Inova, through Mr. Gill's supervisors, has disciplined[1] Mr. Gill because, they have alleged, he has failed to perform his Regular Duties.

20.     But in each circumstance where Inova has made those allegations, Mr. Gill had either performed his Regular Duties, rendering the allegations false, or been unable to perform his Regular Duties because he had been assigned alternative tasks (Plaintiff uses the term "Alternative Duties" to describe, generally, tasks that he was instructed to perform that prevented him from performing his Regular Duties).

21.     Put another way, all of the allegations that Mr. Gill failed to perform his Regular Duties are false or misleading. Some are false because he *actually* performed his Regular Duties, while others are false or misleading because his supervisors had assigned him different tasks (with knowledge that he would be unable to thereafter perform his Regular Duties).

---

[1] The use of the term "discipline" by Plaintiff in this context uses the term's generally-understood meaning in common usage. It may be that, according to Inova's internal policies some or all of the circumstances we point to as "discipline" are not categorized as "discipline." We still allege that Mr. Gill has been disciplined because the thrust of these allegations against Mr. Gill is that he is failing to perform his job and that, whether couched as discipline or something else, there have been and will be consequences for this, up to and including termination.

22.    As an example, consider what occurred in or around September 2016, when, on multiple days, Mr. Gill was directed by his supervisor Elaine Mendis[2] to work at the "Tech Desk."

23.    This circumstance came to a head on or about September 17, 2016, when Ms. Mendis raised her voice at Mr. Gill and embarrassed him in front of his colleagues.

24.    A fair characterization of Ms. Mendis's behavior in this instance was that she "yelled" at Mr. Gill.

25.    Ms. Mendis yelled at Mr. Gill after she had instructed him, once more, to work at the Tech Desk.

26.    Mr. Gill told Ms. Mendis that he was uncomfortable doing so again because he would then, once more, be unable to complete his Regular Duties.

27.    Ms. Mendis then yelled at Mr. Gill in front of his colleagues, telling him that she did not care what he was doing and that he was to go work at the Tech Desk immediately.

28.    Mr. Gill felt embarrassed and humiliated, and he did, following this event, go work at the Tech Desk, but his decision to do so was painful and motivated by a desire to save himself more embarrassment.

---

[2] Ms. Mendis has subsequently left Inova's employ and come forward to share important evidence, referenced in ¶¶ 30-35, below.

29.     Others sympathized with Mr. Gill because at least one colleague approached Mr. Gill and offered emotional support following the altercation.

*Detour: Ms. Mendis Comes Clean About Ms. Davis*

30.     Ms. Mendis later came forward to Mr. Gill and told him that she had been instructed by Ms. Davis to create unnecessary work for him to perform and then to document when, after she so instructed him, he was unable to complete his work.

31.     That occurred on or about May 30, 2018, when Ms. Mendis approached Mr. Gill.

32.     Ms. Mendis asked Mr. Gill to take a smoke break with him because she would be leaving Inova shortly and had some things she wanted to discuss with him.

33.     Ms. Mendis led Mr. Gill to her vehicle in the parking lot.

34.     There, in her vehicle, Ms. Mendis related to Mr. Gill how Ms. Davis had instructed her to assign work to Mr. Gill and thereafter document the duties that Mr. Gill was unable to perform, on account of his efforts to perform the newly-assigned work.

35.     Ms. Mendis then told Mr. Gill that Ms. Davis has "favorites" that she protects and covers for while she has others that she subjects to additional scrutiny.

36.     Mr. Gill has heard the same report from another colleague.

*Returning to Our Regularly Scheduled Pleadings:*
*False & Half-True Allegations Coupled with Subjective and Non-Specific Criticism*

37.    But in the immediate aftermath of his September 2016 altercation with Ms. Mendis, Mr. Gill had no reason to suspect that these efforts by Ms. Mendis might have been orchestrated by Ms. Davis or any particular person.

38.    Shortly after the event, he spoke with HR Business Partner Andrea Burnes, who asked him what he would like to see happen.

39.    Mr. Gill responded by saying that he just did not want to be yelled at and humiliated.

40.    Ms. Burnes then told Mr. Gill that all she could do was to move *him* to a different position.

41.    Mr. Gill asked her where else in the organization she had for him to go.

42.    Ms. Burnes then told him that she had nowhere else that he could work.

43.    Mr. Gill's impression of Ms. Burnes's attitude during the call was that she was possessed of a belief that the incident and Mr. Gill were unimportant and not worth any real intervention from HR.

44.     Another incident occurred on or about June 12, 2017.

45.    On this date, Ms. Davis called Mr. Gill into her office.

46.    When he arrived, she informed him that he was being written up (formally disciplined with written documentation included in his personnel file).

47. Ms. Davis had two concerns that she shared with Mr. Gill that were the purported reasons for this disciplinary action.

48. First, she told Mr. Gill that he "lacked initiative."

49. Mr. Gill asked her what he could do to improve in this area.

50. In response, Ms. Davis said that Mr. Gill used his mobile phone too much.

51. This surprised Mr. Gill for multiple reasons.

52. First, all of the Inova employees in the Behavioral Health unit used their mobile devices from time-to-time, including him and his non-black colleagues.

53. From his vantage, Mr. Gill believed that his mobile phone usage was neither a violation of rules or policies, excessive, or markedly different from his colleagues, including his non-black colleagues.

54. Second, Mr. Gill wasn't aware of others, including any non-black colleagues, being disciplined or scrutinized for their mobile phone usage.

55. Mr. Gill asked Ms. Davis why he, amongst his colleagues, was being disciplined for something they all seemed to do equally.

56. Ms. Davis also shared that Mr. Gill was being written up for his failure to complete his regular duties.

57. To this, Mr. Gill reminded Ms. Davis that he was completing the duties except for those occasions where he was assigned Alternative Duties.

58.    And on the occasions where he had been assigned Alternative Duties, he could, obviously, not perform his Regular Duties.

59.    Ms. Davis responded to Mr. Gill's concerns about her proposed write-up by telling him that she would throw it out.

60.    An additional occasion where Ms. Davis accused Mr. Gill of not completing his Regular Duties occurred on or about November 9, 2017.

61.    Then, Ms. Davis wrote Mr. Gill an email, saying "Can you explain to me why the charts where [*sic*] not stuffed last night. There was also charts not broken down. I would like to meet with you next week when you come in."

62.    On this occasion, the allegation was objectively false: Mr. Gill had, in fact, performed all of his Regular Duties the prior evening.

63.    Mr. Gill responded by email, writing "there were charts made... and all charts were broke down. If you can show me or have documented which one s [*sic*] there were I would love to see them. And ok let me know the date."

64.    By this point, Mr. Gill was beginning to feel exhausted and downtrodden by the frequent false and misleading allegations that he was not completing assigned work. He specifically recalls completing all assigned tasks the prior night, as he had on other occasions.

65.     Ms. Davis did not share with Mr. Gill any objective documentation of a single Regular Duty that Gill ought to have performed but did not, and of course she could not do so because Mr. Gill had performed those duties.

66.     Just four days later, Ms. Davis would lay another false allegation at Mr. Gill's feet.

67.     On November 13, 2017, Ms. Mendis approached Mr. Gill with a written warning, pursuant to Inova's Progressive Discipline policies, which had been prepared and instigated by Ms. Davis.

68.     In that warning, Ms. Davis alleged that "Malik has not progressed in his role as secretary. There is no initiative to comply with routine work."

69.     Plaintiff notes that these concerns, on Ms. Davis's part, are subjective performance measures. Put another way, the *conclusion* that Mr. Gill lacks initiative to do a thing is not falsifiable and is not rooted in any objective criteria.

70.     But Ms. Davis's subsequent allegation in the warning, that "Malik has been told to stuff charts, and [to] offer assistance when he is not doing anything, [but] this has not happened" was false, for multiple reasons.

71.     First, the statement "this has not happened" is objectively false because Mr. Gill was, in fact, stuffing charts and offering assistance.

10

72.     But even if we are a bit more charitable[3] to Ms. Davis, and we assume she meant that "this has not happened [as much as I would like]," the statement cannot be rendered non-misleading. Recall that, throughout this period, Mr. Gill either performed his Regular Duties or mutually exclusive Alternative Duties. But there exist no occasions where Mr. Gill simply failed to complete his Regular Duties in the absence of Alternative Duties.

73.     Ms. Davis continued in the written warning: "No chart packets are being made as asked of him. Malik will also leave charts and not break them down."

74.     Again, these statements consist of objectively false allegations and misleading ones.

75.     Ms. Davis was untruthful when she wrote that "No chart packets are being made as asked of him."

76.     For sure, Mr. Gill was making chart packets at this time.

77.     But even the claim that "Malik will also leave charts and not break them down" was misleading because, again, Mr. Gill always performed either his Regular Duties or mutually exclusive Alternative Duties.

---

[3] Mr. Gill does not waive his entitlement to have his allegations construed in the light most favorable to him in any motions brought under Fed. R. Civ. P. 12.

78.    When Ms. Mendis gave this written warning to Mr. Gill, Mr. Gill signed it and returned it.

79.    But subsequently, Mr. Gill has learned that the version of the document included in his personnel file contains an additional false claim by Ms. Davis.

80.    Mr. Gill's signature does not appear on the version of the warning contained in his personnel file.

81.    Instead, Ms. Davis has written on the version of the warning included in his file that Mr. Gill had "Refused to sign" which was, again, false.

82.    The constant false and misleading attention, discipline, and documentation of Mr. Gill's alleged failures to perform his Regular Duties has resulted in more than just stress, inconvenience, anger, and other feelings on Mr. Gill's part.

83.    This course of conduct by Ms. Davis obviously carries with it the risk that he will ultimately lose his job, or that, should he retain it, he will be less likely to receive pay raises and promotions.

84.    Indeed, these false concerns have now been added by Ms. Davis to Mr. Gill's 2017 Performance Evaluation.

85.    Further, in April 2018, Ms. Davis placed Mr. Gill on a performance improvement plan ("PIP"), which contained no factual claims but that did include these directives:

   a.  Malik will fully label charts with patient label room and allergy labels.

b.  Malik will break down charts.

c.  Malik will stuff charts and make packets to prepare for admissions each shift.

d.  Malik will so [*sic*] 15 minute rounds and sit on the unit when short staffed and his assistance is needed.

e.  Malik will limit cell phone use.

*The Door Incident*

86.  On December 7, 2017, Mr. Gill was verbally attacked and berated by a colleague, Nurse Paulette Townsend (the "Door Incident")

87.  At present, Plaintiff does not allege that Nurse Townsend's tirade against him that evening was race-based or orchestrated by Ms. Davis, but these allegations are included because they give important context to later events, though he reserves the right to amend this Complaint should discovery adduce evidence to that effect.

88.  In short, Mr. Gill observed a patient and staff safety issue arising out of a door being left open that ought to have been closed.

89.  Mr. Gill closed the door on multiple occasions that night, and Nurse Townsend responded aggressively.

90.    During the course of the tirade, Nurse Townsend intimidated Mr. Gill by occupying the space immediately adjacent to his person, cursing at him on multiple occasions from within that space, and following him as he attempted to get away.

91.    Then, Ms. Davis sent Mr. Gill home.

92.    Mr. Gill filed a safety complaint, which Inova refers to as a "Safety Always" complaint, about this incident and Nurse Townsend's tirade.

93.    Nurse Townsend has subsequently apologized to Mr. Gill and he bears no ill will against her.

*We Just Want You to Know What Insubordination Is.*

94.    Following the Door Incident, Mr. Gill met with Ms. Davis and Ms. Burnes.

95.    The purpose of that meeting was, ostensibly, to follow up with Mr. Gill about his ongoing concerns that Inova was not taking the Door Incident seriously.

96.    Recall that Mr. Gill had filed a Safety Always complaint regarding the Door Incident.

97.    And following that complaint, Inova indeed determined that Mr. Gill was correct and that the door should be closed for safety reasons.

98.    Mr. Gill, Ms. Davis, and Ms. Burnes discussed this during the meeting.

99.    But the meeting then turned to a bizarre direction.

14

100. In a memorandum presented to Mr. Gill, Ms. Burnes included, without any apparent reason, three short paragraphs on insubordination. Those paragraphs are included in the photograph below:

A supervisor should be able to assign duties and priorities to employees. That is how we accomplish our Patient Care at Inova. Sometimes these directives are difficult to accomplish. Should this be the situation, or if you feel the situation is unsafe, it is Inova's expectation that this is discussed by both supervisor and employee in a respectful way.

A definition of insubordination is as follows:
- Refusal to perform work properly assigned by at supervisor (i.e. reasonable, safe and legal).
- Disrespectful behavior toward a manager or supervisor (i.e.. Verbally or physically intimidating a manager or Supervisor or speaking loudly to or about a supervisor).

Insubordination is a type 2 violation under the Inova Progressive Discipline process (see HR policy #3024).

101. Mr. Gill found the inclusion of this language suspicious, and it is, in fact, suspicious, because Mr. Gill had not committed or been accused of insubordination.

102. What he *had* done, and what the meeting was intended to address, was Mr. Gill's concerns about a safety issue and a verbal attack he suffered as a result of his insistence on safety.

103. Mr. Gill asked Ms. Davis and Ms. Burnes why they had included that language.

104. One or the other of them replied that they just thought that Mr. Gill should have it.

105. Mr. Gill asked, twice, if there were allegations that he had committed insubordination.

106. They responded by looking at him in silence.

107.    As an aside, Mr. Gill's Safety Always complaint was most likely protected activity under Virginia law, *see* Va. Code. § 40.1-51.2:1[4].

108.    And yet, Ms. Davis and Ms. Burnes's response to Mr. Gill's complaint, though they agreed with his safety concerns, was to give him a memorandum wherein they anomalously warned him about insubordination.

*Evidence of Race-Based Causation*

109.    On multiple occasions, Ms. Davis has made a hurtful and untrue race-based remark about Mr. Gill.

110.    She has told Mr. Gill that he does not like white women.

111.    This perplexing, and untrue, allegation has concerned Mr. Gill for a while, but on one occasion it was particularly uncomfortable.

112.    On October 10, 2016, Ms. Davis falsely stated in front of Mr. Gill and coworkers that Mr. Gill did not like white women.

113.    Here is important context for that event: A day or so prior, Mr. Gill intervened with a patient who had attempted to strike a nurse.

114.    Mr. Gill was off for one day following that incident and, upon his return, was relating the encounter to some coworkers.

---

[4] This action is not premised upon VOSHA retaliation or discrimination.

16

115.   Ms. Davis was among those coworkers and told the group that Mr. Gill would not have intervened to prevent someone from striking her, because she was a white women and Mr. Gill did not like white women.

116.   Mr. Gill still recalls this moment and the shock he felt, sitting there, humiliated in front of his coworkers by his superior.

117.   Needless to say, Ms. Davis's statement was race-based (would not have been made but for Mr. Gill's race), unwelcome, offensive, and without basis in fact.

118.   Additionally, in investigating this matter Mr. Gill, through undersigned counsel, reached out to witnesses, including Mr. Gill's current and former coworkers.

119.   One coworker of Mr. Gill responded, under penalty of perjury, to a questionnaire wherein we asked the following questions and the witness gave the following answers:

> Q: Do you believe that Inova Health Care Services's employees or agents subjected Mr. Gill to race-based discrimination and/or retaliation for complaints of discrimination?
>
> A: Yes
>
> Q: How certain do you feel, from 0% to 100%, that Inova Health Care Services's employees or agents subjected Mr. Gill

17

to race-based discrimination and/or retaliation for complaints of discrimination?

A: 99

Q: Do you know who, among Inova Health Care Services's employees or agents, subjected Mr. Gill to race-based discrimination and/or retaliation for complaints of discrimination?

A: I'm sure I know who among Inova Health Care Services's employees or agents subjected Mr. Gill to race-based discrimination and/or retaliation for complaints of discrimination.

Q: What actions have Inova Health Care Services's employees or agents taken that you believe subjected Mr. Gill to race-based discrimination and/or retaliation for complaints of discrimination?

A: I have seen Kim Davis and nurse Leslie single out people and treat them unfairly, including myself.

Q: Did you personally observe the event(s) you described in answering the above question?

A: I personally observed all of the events I described above.

*Evidence of Retaliatory Causation*

120.    Mr. Gill filed his EEOC charge on February 21, 2018.

121.    Mr. Gill knows that Inova was put on notice of this charge because it sent the EEOC a position statement on April 13, 2018.

122.    But Mr. Gill does not yet know *when* Inova or any particular employee such as Ms. Davis was put on notice of this occurrence because (1) the EEOC has not responded to Mr. Gill's FOIA request and (2) discovery has not yet occurred.

123.    But Ms. Davis (and Ms. Burnes) have exhibited behavior that demonstrates the likelihood of an intent to retaliate against Mr. Gill because he lodged protected complaints.

124.    In ¶¶ 100 - 108, Mr. Gill makes reference to apparently retaliatory warnings regarding insubordination that Ms. Davis and Ms. Kim included in a memorandum they gave to him in response to a protected safety complaint.

125.    That event could not have been reprisal against Mr. Gill for his EEOC charge, because he had not yet filed it.

126.    But it is a demonstration of the way that Ms. Davis and Ms. Burnes responded to one protected complaint that Mr. Gill filed after the door incident, and his EEOC Charge was premised on the same activity.

127.    In addition, Mr. Gill was put on a PIP by Ms. Davis on April 12, 2018, the day before it sent its position statement to the EEOC.

128.    While the timing of the PIP vis-à-vis the position statement is likely coincidental, it is almost certainly true that Inova and Ms. Davis were on notice of Mr. Gill's charge at this point.

129.    Finally, all of the occasions where Mr. Gill has been sent home or excluded from meetings occurred after Mr. Gill initiated his EEOC charge and Inova sent their position statement to the Commission.

## COUNT I
*Race-Based Hostile Work Environment – Title VII*

130.    Mr. Gill realleges all prior allegations in this Count I.

131.    Mr. Gill is Inova's employee.

132.    Inova is Mr. Gill's employer.

133.    Since about the summer of 2016, Mr. Gill's supervisors have created and perpetrated a campaign of false or misleading allegations about Mr. Gill's performance, documenting those false or misleading allegations as if they were true in his personnel file, and using those false or misleading allegations as the basis for discipline and the imposition of a PIP.

134.    This campaign has been orchestrated by Ms. Davis, who has made false race-based allegations about Mr. Gill.

135.    Inova has been aware of this ongoing behavior because it was perpetrated by a director and because Mr. Gill brought it to their attention on multiple occasions.

136.    Nevertheless, Inova neglected to stop it.

137.    As a result, Mr. Gill has suffered a variety of unpleasant mental states, to include feelings of numbness, helplessness, anger, anxiety, sleep disturbances, lethargy, irritability, mood swings, and general discouragement.

138.    Mr. Gill subjectively found and finds this conduct so severe and pervasive that it has altered the terms and conditions of his employment with Inova.

139.    Further, any reasonable person in Mr. Gill's shoes would find this circumstance sufficiently severe and pervasive as to alter the terms and conditions of their employment because, regardless of what he does (including performing all tasks that are assigned to him), Ms. Davis will not let up with her false or misleading criticisms and she is recruiting others, to include Ms. Mendis, to assist in her campaign.

## COUNT II
*Race-Based Hostile Work Environment – Section 1981*

140.    Mr. Gill realleges all prior allegations in this Count II.

141.    Mr. Gill is Inova's employee.

142.    Inova is Mr. Gill's employer.

143.    Since about the summer of 2016, Mr. Gill's supervisors have created and perpetrated a campaign of false or misleading allegations about Mr. Gill's performance,

documenting those false or misleading allegations as if they were true in his personnel file, and using those false or misleading allegations as the basis for discipline and the imposition of a PIP.

144.   This campaign has been orchestrated by Ms. Davis, who has made false race-based allegations about Mr. Gill.

145.   Inova has been aware of this ongoing behavior because it was perpetrated by a director and because Mr. Gill brought it to their attention on multiple occasions.

146.   Nevertheless, Inova neglected to stop it.

147.   As a result, Mr. Gill has suffered a variety of unpleasant mental states, to include feelings of numbness, helplessness, anger, anxiety, sleep disturbances, lethargy, irritability, mood swings, and general discouragement.

148.   Mr. Gill subjectively found and finds this conduct so severe and pervasive that it has altered the terms and conditions of his employment with Inova.

149.   Further, any reasonable person in Mr. Gill's shoes would find this circumstance sufficiently severe and pervasive as to alter the terms and conditions of their employment because, regardless of what he does (including performing all tasks that are assigned to him), Ms. Davis will not let up with her false or misleading criticisms and she is recruiting others, to include Ms. Mendis, to assist in her campaign.

## COUNT III
*Retaliatory Hostile Work Environment – Title VII*

150.   Mr. Gill realleges all prior allegations in this Count III.

151.   Mr. Gill is Inova's employee.

152.   Inova is Mr. Gill's employer.

153.   Since filing his EEOC charge, Mr. Gill has been consistently excluded from meetings and sent home from work.

154.   This campaign has been orchestrated by Ms. Davis, who has made false race-based allegations about Mr. Gill.

155.   Inova has been aware of this ongoing behavior because it was perpetrated by a director and because Mr. Gill brought it to their attention on multiple occasions.

156.   Nevertheless, Inova neglected to stop it.

157.   As a result, Mr. Gill has suffered a variety of unpleasant mental states, to include feelings of numbness, helplessness, anger, anxiety, sleep disturbances, lethargy, irritability, mood swings, and general discouragement.

158.   Mr. Gill subjectively found and finds this conduct so severe and pervasive that it has altered the terms and conditions of his employment with Inova.

159.   Further, any reasonable person in Mr. Gill's shoes would find this circumstance sufficiently severe and pervasive as to alter the terms and conditions of their employment because, regardless of what he does (including performing all tasks that are

assigned to him), Ms. Davis will not let up with her false or misleading criticisms and she is recruiting others, to include Ms. Mendis, to assist in her campaign.

## COUNT IV
*Retaliatory Hostile Work Environment – Section 1981*

160.    Mr. Gill realleges all prior allegations in this Count IV.

161.    Mr. Gill is Inova's employee.

162.    Inova is Mr. Gill's employer.

163.    Since filing his EEOC charge, Mr. Gill has been consistently excluded from meetings and sent home from work.

164.    This campaign has been orchestrated by Ms. Davis, who has made false race-based allegations about Mr. Gill.

165.    Inova has been aware of this ongoing behavior because it was perpetrated by a director and because Mr. Gill brought it to their attention on multiple occasions.

166.    Nevertheless, Inova neglected to stop it.

167.    As a result, Mr. Gill has suffered a variety of unpleasant mental states, to include feelings of numbness, helplessness, anger, anxiety, sleep disturbances, lethargy, irritability, mood swings, and general discouragement.

168.    Mr. Gill subjectively found and finds this conduct so severe and pervasive that it has altered the terms and conditions of his employment with Inova.

169.    Further, any reasonable person in Mr. Gill's shoes would find this circumstance sufficiently severe and pervasive as to alter the terms and conditions of their employment because, regardless of what he does (including performing all tasks that are assigned to him), Ms. Davis will not let up with her false or misleading criticisms and she is recruiting others, to include Ms. Mendis, to assist in her campaign.

## RELIEF DEMANDED

170.    Mr. Gill requests a Court order directing Defendant to cease documenting and disciplining him based on false and/or misleading allegations.

171.    Mr. Gill requests a permanent injunction separating him from reporting to Ms. Davis without any negative employment consequences for Mr. Gill.

172.    Mr. Gill also reserves the right to base subsequent requests for equitable relief on the facts adduced in discovery and trial.

173.    Mr. Gill requests non-economic compensatory damages in an amount to be determined by a jury at trial, but in no event less than $1.00.

174.    Should discovery produce sufficient evidence of malice and or reckless disregard for Mr. Gill's federally protected rights, Mr. Gill reserves the right to request punitive damages in an amount to be determined by a jury at trial, but in no event less than $1.00.

25

175. Of course, the statutes at issue make compensatory damages available should Mr. Gill prevail. Mr. Gill will thus pursue them in a reasonable amounts that are reasonably connected to the facts. But this action is not primarily about money, and Mr. Gill primarily seeks the opportunity to continue in his employment unhindered by discriminatory or retaliatory animus. Thus, though he does not seek one, should he achieve a merely nominal verdict, he will still consider this case 100% successful.

176. Mr. Gill requests an award of reasonable attorneys' fees.

177. Mr. Gill requests an award of costs.

**MR. GILL DEMANDS TRIAL BY JURY ON ALL ISSUES SO TRIABLE**
Dated: September 10, 2018

Respectfully Submitted,

/s/
Jacob M. Small (VSB # 84460)
Attorney for Malik Gill
J. Madison PLC
1750 Tysons Blvd.
Suite 1500
McLean, Virginia 22102
P (703) 910-5062
F (703) 910-5107
jmsmall@jmadisonplc.com

26